# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DAWN M. BROYLES,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00005 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **ANDREW M. SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Dawn M. Broyles, ("Broyles"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.""" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Broyles protectively filed her applications for DIB and SSI on December 1, 2016, alleging disability as of January 1, 2009, due to bulging and degenerative discs in her back and anxiety. (R. at 10, 80, 96, 252.) The claims were denied initially and upon reconsideration. (R. at 10, 66-92, 95-122, 127-29, 132-34, 145-46, 148-50, 152-57, 159-61.) Broyles then requested a hearing before an administrative law judge, ("ALJ"). (R. at 162-64.) The ALJ held a video hearing on January 29, 2019, at which Broyles was represented by counsel. (R. at 37-65.)

By decision dated March 6, 2019, the ALJ denied Broyles's claims. (R. at 10-25.) The ALJ found that Broyles met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2013. (R. at 12.) The ALJ found that Broyles had not engaged in substantial gainful activity since January 1, 2009, the alleged onset date. (R. at 12.) The ALJ determined that Broyles had severe impairments, namely lumbar degenerative disc disease, asthma, depression and anxiety, but she found that Broyles did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12-15.) The ALJ found that Broyles had the residual functional capacity to perform sedentary[4] work, except that she could lift or

---

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

carry items weighing up to 20 pounds occasionally and 10 pounds frequently, and she could stand and walk two hours in an eight-hour workday. (R. at 15). The ALJ found that Broyles could occasionally push/pull, climb ramps and stairs, balance, kneel, stoop and crouch; never crawl; frequently reach overhead; never be exposed to hazardous machinery, working at unprotected heights, climbing ladders, ropes or scaffolds or working on vibrating surfaces or be exposed to excessively loud background noise such as heavy traffic or jackhammering type construction equipment in the immediate work environment. (R. at 15.) The ALJ further found that Broyles was able to understand, remember and carry out simple instructions in repetitive, unskilled work; to attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer, but was able to complete a normal eight-hour workday/40-hour workweek; occasionally interact with the general public, co-workers and supervisors; and respond appropriately to supervisors, co-workers and usual work situations. (R. at 15.) The ALJ found that Broyles was unable to perform her past relevant work. (R. at 23.) Based on Broyles's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Broyles could perform, including the jobs of an assembler, a weight tester and an addressing clerk. (R. at 23-24.) Thus, the ALJ concluded that Broyles was not under a disability as defined by the Act from January 1, 2009, through the date of the decision, and she was not eligible for SSI and DIB benefits. (R. at 24-25.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

After the ALJ issued her decision, Broyles pursued her administrative appeals, (R. at 217-19.) The Appeals Council denied Broyles's request for review, (R. at 1-

5), and Broyles then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Broyles's motion for summary judgment filed October 20, 2020, and the Commissioner's motion for summary judgment filed November 18, 2020.

## II. Facts[5]

Broyles was born in 1975, (R. at 41), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Broyles has a college education with a bachelor's degree in public health. (R. at 41.) She has past relevant work experience as a clerk with a police department and as a sales clerk. (R. at 41-42.) Broyles testified that she started having a lot of back pain, anxiety and depression in 2009. (R. at 44.) Broyles also testified that she experienced panic attacks, during which she had difficulty breathing and felt nauseated and dizzy, with tingling in her arms and fingers. (R. at 46.) She said that she experienced about three panic attacks each week, lasting about 10 minutes each. (R. at 46.) Broyles said that, after an attack, she felt exhausted for 30 minutes or more. (R. at 54.) Broyles testified that she had constant pain in her right lower back. (R. at 47.) Broyles said that she would change positions among reclining and lying flat, sitting and standing to attempt to relieve her pain. (R. at 47.) She said that she could stand for only 10 minutes at a time, could carry less than five pounds and could walk only a few feet at a time. (R. at 47-48.) Broyles said she could no longer work due to her pain,

---

[5] Broyles challenges only the ALJ's finding as to her mental residual functional capacity. Therefore, the recitation of the relevant facts will concentrate on the evidence of Broyles's mental impairments.

depression and panic attacks. (R. at 49.) She said that her depression made it difficult for her to deal with other people. (R. at 55.)

Broyles testified that her back pain radiated into her right hip and leg to her ankle. (R. at 50.) Broyles stated that she underwent physical therapy, epidural injections, medial branch blocks and radiofrequency ablation in an attempt to ease her pain. (R. at 51.) Broyles testified that, prior to 2013, she had difficulty standing or sitting more than 15 minutes at a time. (R. at 52.) Broyles said that, after she got her children off to school in the morning, she would recline or lie down flat. (R. at 53.) Broyles said that she spent three-fourths of the day reclining or lying flat. (R. at 53.) She said that she was not able to stoop, squat, bend or kneel. (R. at 53.) Broyles said that she also suffered from migraine headaches at least three times a week for at least three hours at a time. (R. at 55-56.) She said that, when she had a migraine, she would spend the day lying in a dark, quiet place. (R. at 55.) Broyles also said that walking and lifting affected her asthma. (R. at 56.)

Asheley Wells, a vocational expert, was present and testified at Broyles's hearing. (R. at 57-63.) Wells stated that Broyles's past work as a police department secretary was skilled, sedentary work, and her past work as an inventory clerk was semi-skilled, medium[8] work. (R. at 57.) Wells was asked to consider a hypothetical individual of Broyles's age, education and work history, who had the residual functional capacity to lift and carry 20 pounds occasionally, 10 pounds frequently, stand and walk no more than two hours and sit for no more than six hours in an eight-hour workday, push and pull occasionally, occasionally climb ramps and stairs,

---

[8] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2020).

balance, kneel, stoop and crouch, but never crawl, frequently reach overhead, but have no exposure to hazardous machinery, unprotected heights, climbing ladders, ropes or scaffolds, working on vibrating surfaces or around excessively loud background noise, who was able to understand, remember and carry out simple instructions in repetitive, unskilled work, who could attend, persist and concentrate for two-hour segments, with normal breaks as allowed by the employer, who was able to complete a normal eight-hour day and 40-hour workweek and who was able to have occasional interaction with the general public, co-workers and supervisors and respond appropriately to supervision and usual work situations. (R. at 58-59.) Wells said that such an individual could not perform Broyles's past relevant work. (R. at 59.) Wells testified, however, that such a person could perform the sedentary, unskilled jobs of an assembler, a weight tester and an addressing clerk, which were available in significant numbers in the national and regional economies. (R. at 59-60.) Wells testified that if this individual would miss more than two days of work a month, she could not perform competitive work. (R. at 60.) Wells also testified that if the individual was unable to deal with everyday work stresses or complete tasks in a timely manner, it would preclude competitive employment. (R. at 61-62.)

In rendering her decision, the ALJ reviewed records from Richard J. Milan, Jr., Ph.D., a state agency psychologist; William Carne, Ph.D., a state agency psychologist; Dr. Nicolas Tulou, M.D., a state agency physician; Union Drug; CVS Pharmacy; Norton Community Hospital; Community Physicians of Norton; Blue Ridge Neuroscience Center, P.C.; Mountain States Medical Group Pain Management; TN Brain and Spine; Pain Consultants of East Tennessee; Lonesome Pine Hospital; Vada Rose, F.N.P.;  B. Wayne Lanthorn, Ph.D.; Dr. Tamy Perng, D.O.; Dr. David C. Nauss, M.D.; Dr. James M. Wilson, M.D.; and Premier Surgical Associates, PLLC.

On July 21, 2017, Richard J. Milan, Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Broyles suffered from a depressive, bipolar and related disorder and an anxiety and obsessive-compulsive disorder. (R. at 73, 86-87.) He found that Broyles had no restrictions on her ability to understand, remember or apply information, to interact with others, to concentrate, persist or to maintain pace and to adapt or manage herself. (R. at 73.) Milan stated that Broyles's mental health symptoms were well-controlled with medication and did not limit her functioning. (R. at 73, 86.)

On December 6, 2017, William Carne, Ph.D., a state agency psychologist, completed two PRTFs – one as of the date last insured, and another as of December 6, 2017, both indicating that Broyles suffered from a depressive, bipolar or related disorder and an anxiety and obsessive-compulsive disorder. (R. at 103, 118.) In the evaluation as of Broyles's date last insured, Carne found there was insufficient evidence to determine her restrictions. (R. at 118.) In the current evaluation, he found that Broyles had no restrictions on her ability to understand, remember or apply information, to interact with others and to adapt or manage herself, and she had mild restrictions on her ability to concentrate, persist or maintain pace. (R. at 103.)

On December 6, 2017, Dr. Nicolas Tulou, M.D., a state agency physician, completed two physical residual functional capacity assessments – one as of the date last insured, and another as of December 6, 2017. (R. at 105-07, 119-21.) Dr. Tulou found that, as of the date last insured, Broyles had the residual functional capacity to occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 119.) He found that Broyles could stand and walk up to six hours and sit up to six hours in an eight-hour workday and could push and pull up to her weight limits. (R. at 119-20.) He said that Broyles could

frequently climb ramps and stairs, kneel and crawl, and she could occasionally climb ladders, ropes or scaffolds, stoop and crouch. (R. at 120.) He said that Broyles's ability to balance was unlimited. (R. at 120.) He also said that she should avoid concentrated exposure to extreme cold, humidity, noise, vibrations, fumes, odors, dusts, gases, poor ventilation and hazards such as machinery and heights. (R. at 120-21.) No manipulative, visual or communicative limitations were noted. (R. at 120.) Dr. Tulou's current evaluation of Broyles was the same, except he found she could occasionally kneel and crawl. (R. at 105-07.)

On February 2, 2011, Broyles sought treatment at the Emergency Department of Norton Community Hospital for lower back pain lasting two and a half days. (R. at 409-10.) She also complained of a history of COPD and migraine headaches. (R. at 409.) The physician noted that Broyles did not appear to be in pain distress, and all findings were normal, including strength and range of motion. (R. at 410.) The physician diagnosed right back strain and discharged Broyles home. (R. at 410.)

Broyles attended physical therapy at The Regional Rehab Center from February 8, 2011, to May 9, 2011. (R. at 362-66, 379-404, 559-60, 960-85.) At her initial evaluation, Broyles complained of low back pain with no known injury. (R. at 364, 983.) Broyles said that the pain was on her left side, but it had progressed to the center and right side as well. (R. at 364, 983.) She said the pain ran into her abdomen and down her right leg a couple of times, with mild numbness and tingling into the right leg to the knee. (R. at 364, 983.) Broyles reported difficulty lifting, bending, staying in one position for prolonged periods of time, performing household chores, caring for her younger children and resting. (R. at 364, 983-84.) Broyles said that her resting pain was a seven on a 10-point scale, and her pain with activity was a 10 with sharp, radiating pain. (R. at 365, 984.) She reported her pain

was exacerbated by bending and sitting and relieved by changing positions and medication. (R. at 365, 984.) Broyles said her pain medication only mildly reduced her pain. (R. at 365, 984.)

She was assessed with deceased core stability, decreased trunk range of motion and pain in her lumbar spine. (R. at 364, 983.) Her spine range of motion was within normal limits for left lateral flexion and rotation to the right and left. (R. at 365, 984.) She had minimal range of motion loss with right later flexion and extension, but major loss with flexion. (R. at 365, 984.) Tiffany Hamilton, M.S.P.T., recommended four weeks of physical therapy with three visits a week. (R. at 366, 985.) In a Discharge Summary, dated May 9, 2011, Hamilton stated that Broyles was being discharged because "Maximal Level Reached." (R. at 559-60, 960-61.) Broyles reported her pain level at that time as a 0 on a 10-point scale at rest and a four on a 10-point scale with activity. (R. at 559, 960.) Hamilton noted that Broyles's back and leg pain had been reduced significantly. (R. at 559, 960.) Broyles reported that bending and sitting exacerbated her pain, and changing positions and medication relieved her pain. (R. at 559, 960.) Hamilton stated Broyles demonstrated improved hip flexibility and faster cadence during ambulation, but she continued to have limitations in trunk range of motion and core stability. (R. at 560, 961.) Hamilton recommended a Lone traction unit, as Broyles had reported some decreased pain with lumbar traction. (R. at 559, 960.)

A CT scan and x-ray of Broyles's lumbar spine, performed on February 22, 2011, showed no evidence of spondylolisthesis or spondylolysis. (R. at 407, 542.) There were some developmental changes noted to the endplates at the L4 and L5 levels from an earlier image. (R. at 407, 542.) Minimal spur formation was noted. (R. at 407, 542.)

On March 2, 2011, Broyles, on a Review of Systems form, related to a visit with Dr. Tamy Perng, D.O., stated that she had experienced no headaches or joint pain in the previous 30 days. (R. at 370.) Nevertheless, she also complained of back pain and migraines. (R. at 369-70.) She also complained of suffering from depression. (R. at 369.)

Broyles treated with Community Physicians from June 17, 2009, to September 16, 2014, for, among other ailments, complaints of lumbosacral pain and radiculopathy, asthma, headaches, depression and anxiety. (R. at 449-504, 602-706.) Broyles established care with Dr. Matthew W. Cusano, M.D., on June 17, 2009, and provided a history of migraine headaches once a month or every other month. (R. at 503.) While Dr. Cusano documented no mental health complaints, he diagnosed an anxiety disorder and prescribed Lexapro. (R. at 504.) Dr. Cusano recommended that Broyles see a counselor, but she said she did not want to do this. (R. at 504.) On July 23, 2009, Broyles complained of fatigue and difficulty sleeping. (R. at 499.) She stated her anxiety was not controlled, and she requested a different medication. (R. at 499.) Dr. Cusano prescribed Effexor XR. (R. at 499.) On August 27, 2009, Broyles reported a good response to Effexor, with her anxiety doing better. (R. at 495.) Oddly, Dr. Cusano diagnosed depression, but not anxiety. (R. at 495.)

On October 5, 2009, Broyles told Vada Rose, F.N.P., a family nurse practitioner at Community Physicians, that she had not experienced a migraine headache in three months. (R. at 488.) Rose noted that Broyles had a history of asthmatic bronchitis, but she continued to smoke a pack of cigarettes a day. (R. at 488.) Rose also noted that Broyles's anxiety was managed with Effexor, she was feeling better and did not want to see a counselor at that time. (R. at 488.) On January 20, 2010, Broyles reported her anxiety was doing better on medication. (R. at 484.)

Rose noted that Broyles's migraine headaches appeared to be controlled with medication. (R. at 485.)

On April 20, 2010, Broyles complained of fatigue to Dr. Cusano. (R. at 479.) Dr. Cusano noted that Broyles's anxiety disorder was stable, and her fatigue was likely caused by her allergies. (R. at 479-80.) On July 7, 2010, Broyles reported that she was taking Ultram for ankle pain, and Dr. Cusano expressed concern about drug interactions with her Effexor and her migraine medication, Relpax. (R. at 476.) Broyles stated her fatigue was doing better. (R. at 476.) Dr. Cusano switched Broyles's migraine medication to Imitrex. (R. at 476.) On September 27, 2010, Broyles reported that her leg pain was doing much better after going to the pain clinic and receiving a prescription for Neurontin. (R. at 474.) She complained of continuing problems with fatigue and snoring and gasping for breath at night. (R. at 474.) On November 24, 2010, Broyles reported that her fatigue was doing about the same. (R. at 471.)

On February 8, 2011, Broyles reported to Rose that she had hurt her back on February 2, 2011, and had sought treatment at an emergency room. (R. at 466.) She stated that she did not know if she had stooped over to pick up one of her children and might have pulled a muscle. (R. at 466.) Broyles said her back just started hurting. (R. at 466.) She said her pain was a nine on a 10-point scale. (R. at 466.) She stated that she received prescriptions for muscle relaxers, ibuprofen and Lortab, with the muscle relaxers helping a little. (R. at 466.) She denied any leg pain. (R. at 466.) Rose prescribed physical therapy three times a week for four weeks and Lortab and Flexeril. (R. at 466.)   On February 17, 2011, Broyles reported to Rose that her back pain improved for about an hour after each physical therapy session and, then, worsened again. (R. at 463.) On March 3, 2011, Broyles reported that her back pain

had improved slightly. (R. at 461.) On March 24, 2011, Rose noted that Broyles complained of continuing low back pain, which she stated physical therapy was helping. (R. at 460.) She also stated that Flexeril helped her rest. (R. at 460.)

On June 28, 2011, Dr. Cusano noted that Broyles had multiple complaints, including back pain with radiation down her right leg and migraine headaches. (R. at 457-58.) Dr. Cusano noted that Broyles had completed physical therapy and been prescribed anti-inflammatories, muscle relaxers and pain medication, but she continued to experience symptoms. (R. at 457.) Dr. Cusano's exam revealed tenderness in the lumbosacral area and positive straight leg raise on the right side. (R. at 457.) Dr. Cusano ordered an MRI of Broyles's lumbar spine to be performed before she could receive epidural injections. (R. at 457.) On July 7, 2011, Dr. Cusano noted that Broyles complained of back pain and migraine headaches, among other ailments. (R. at 455.) He stated that Broyles suffered from lumbar radiculopathy, but she had not undergone an MRI as previously directed. (R. at 455.) He further stated that he wanted to reduce Broyles's pain medication over time. (R. at 455.)

An MRI of Broyles's lumbar spine, performed on July 27, 2011, showed a slight narrowing of the L3-4 disc space, but no disc herniation or narrowing of the central spinal canal or neural foramina. (R. at 954.) There was a mild symmetric bulging of the disc at the L5-S1 disc space level with no significant narrowing of the central spinal canal or neural foramina. (R. at 954.) The radiologist's impression was mild degenerative changes of the lumbar spine and mild symmetric bulging of the disc at the L5-S1 level. (R. at 954.)

On September 16, 2011, Rose noted that Broyles's migraine headaches were stable, but she continued to experience low back pain. (R. at 1035.) Rose referred Broyles to Dr. Nauss for steroid injections. (R. at 1035.)

Dr. David C. Nauss, M.D., saw Broyles on October 4, 2011, for complaints of low back and right lower extremity pain for the previous seven to eight months. (R. at 925-27, 1027-28.) Dr. Nauss noted low back pain, midline, right-sided, constant ache, occasionally sharp, rated as high as a nine on a 10-point scale and right lower extremity pain, posterior thigh down to the knee, noncontinuous ache, occasionally sharp, rated as high as an eight on a 10-point scale. (R. at 925, 1027.) Broyles denied any lower extremity weakness, numbness or bowel or bladder dysfunction. (R. at 925, 1027.)  According to Broyles, her symptoms increased with prolonged sitting, bending or twisting and sometimes were decreased by lying down and heat. (R. at 925, 1027.) Broyles gave a history of depression, but she denied any history of anxiety. (R. at 925, 1027.)

Dr. Nauss noted that Broyles was oriented to person, place and time, and her knee and ankle reflexes and motor exam were normal. (R. at 926.) He said that palpation of Broyles's lower back did not reveal any point tenderness. (R. at 926.) Straight leg raising was essentially normal. (R. at 926.) According to Dr. Nauss, an MRI performed on July 27, 2011, showed slight narrowing at the L3-4 and L5-S1 levels, with mild symmetric disc bulging. (R. at 926.)  Dr. Nauss performed lumbar epidural steroid injections on Broyles on October 5 and 31, 2011. (R. at 923-24, 1025-26.)

On January 11, 2012, Broyles reported to Rose that she received no relief from the lumbar epidural injections by Dr. Nauss. (R. at 1018.) Broyles stated that her

pain medication and muscle relaxers helped "briefly" but offered no long-term relief. (R. at 1018.) She said activity worsened her pain, and rest helped it. (R. at 1018.) Broyles denied spasm, stiffness and leg numbness or weakness. (R. at 1018.) At another point in her report, Rose stated that Broyles suffered from spasm and decreased range of motion. (R. at 1018.) Rose noted that Broyles's headaches were doing well, and she noted no complaints regarding Broyles's anxiety and depression. (R. at 1018.)

Broyles saw Dr. Ken Smith, M.D., with Blue Ridge Neuroscience Center, P.C., for an initial consultation for right lower lumbar pain on March 21, 2012. (R. at 712-15.) Dr. Smith noted that Broyles had suffered from lumbar and right low extremity pain since February 2011. (R. at 712.) She denied any accident or injury to her back. (R. at 712.) Her primary care provider ordered physical therapy, which had resolved her right lower extremity pain. (R. at 712.) She reported having two epidural steroid injections, with moderate relief after the first, but increased lumbar pain after the second. (R. at 712.) Broyles described constant, burning pain in her lumbar region. (R. at 712.) She reported that standing and walking aggravated her pain, with no alleviating factors. (R. at 712.) She denied any focal or lateralizing neurological deficits, bowel or bladder dysfunction. (R. at 712.)

Broyles reported a history of asthma, anxiety, depression and migraines. (R. at 712.) Broyles denied any history of syncope, seizures, transient ischemic attacks, stroke, paresthesia, anesthesia or paralysis. (R. at 713.) She reported suffering from depression, which was treated with medication. (R. at 713.) Dr. Smith noted that Broyles was alert and cooperative and did not appear in acute distress. (R. at 713.) Broyles's gait was nonantalgic, an examination of her spine, ribs, pelvis and upper and lower extremities revealed no misalignment, asymmetry, crepitation,

tenderness, masses, deformities or effusions, and full range of motion, and straight leg raise was negative bilaterally. (R. at 713.) Dr. Smith stated that Broyles's muscle strength was 5+, and her tone was normal with no atrophy in her head, neck, spine, ribs, pelvis or upper or lower extremities. (R. at 714.) Finger-to-nose testing was performed without difficulty, and her sensation was intact to light touch and pinprick in the upper and lower extremities. (R. at 714.) Deep tendon reflexes were 2+ in her biceps, triceps, brachioradialis, knees and ankles. (R. at 714.) She was oriented to person, place and time, and her mood and affect were appropriate for her age and situation. (R. at 714.)

Dr. Smith stated that an MRI, performed on July 27, 2011, showed a central herniation at the L5-S1 level, abutting, but not displacing, the central canal with no foraminal stenosis or nerve root compression. (R. at 714.) Dr. Smith diagnosed lumbar herniated disc, chronic low back pain and lumbar degenerative disc disease. (R. at 714.) Dr. Smith told Broyles that he found no indication for surgical intervention. (R. at 714.) Dr. Smith recommended physical therapy and epidural steroid injections. (R. at 714.) He referred her back to her primary care provider for any such referrals. (R. at 714.) Dr. Smith stated that Broyles "may continue her employment and activities as a homemaker." (R. at 715.)

On May 17, 2012, Rose noted that Broyles's anxiety was asymptomatic, and her headaches were doing well, but she reported back pain and decreased range of motion. (R. at 1014.) At one point, Rose noted that Broyles complained of muscle spasm, and at another point, she noted no spasm. (R. at 1014.) Broyles reported no paresthesia and no leg numbness or weakness. (R. at 1014.) On September 14, 2012, Rose noted that Broyles's headaches were doing well, her anxiety was asymptomatic, and she had no back pain or back muscle spasm, no decreased range

of motion and no back or leg numbness or weakness. (R. at 1009.) Rose said that Broyles's lumbar pain was asymptomatic. (R. at 1009.) On January 20, 2013, Rose noted that Broyles's anxiety was asymptomatic, and her headaches were doing well. (R. at 999.) Rose also noted a normal gait and normal affect and mood. (R. at 1001-002.) On April 22, 2013, Broyles reported that her migraine headaches were doing well, with no recent significant events. (R. at 702.) Rose also noted that Broyles's anxiety was asymptomatic. (R. at 702.) While Broyles reported joint pain and stiffness, Rose noted no joint swelling or limb pain or swelling. (R. at 703.)  Rose noted that an MRI, performed in July of 2011, revealed a bulging disc at the L5-S1 level. (R. at 703.) Broyles denied any bowel or bladder dysfunction, but reported pain at a nine on a 10-point scale with range of motion and pain going down her right leg and knee. (R. at 703.) She reported no relief with Lortab, but some relief with Flexeril. (R. at 703.) She reported that physical therapy did not help. (R. at 703.) Rose noted that Broyles's affect and mood were normal, and she was oriented to person, place and time. (R. at 705.) Broyles had a normal gait. (R. at 705.)

On August 13, 2013, Broyles reported that her migraine headaches were doing well, and her anxiety disorder was asymptomatic, with no symptoms reported. (R. at 669.) Rose noted joint pain and stiffness, but no joint swelling or limb pain or swelling. (R. at 670.) Rose stated that Broyles's affect and mood were normal, and she was oriented to person, place and time. (R. at 673.) Broyles had a normal gait. (R. at 673.) On October 7, 2013, Broyles, again, reported that her migraine headaches were doing well, and her anxiety disorder was asymptomatic, with no symptoms reported. (R. at 663.) Rose, again, noted joint pain and stiffness, but no joint swelling or limb pain or swelling. (R. at 664.)

An MRI of Broyles's spine, performed on September 11, 2013, showed scattered mild degenerative changes in her lumbar spine, with no appreciable change from a July 2011 MRI result. (R. at 679.) The report noted small disc bulging at the T11-12, L3-4, L4-5 and L5-S1 levels. (R. at 679.)

On November 4, 2013, Broyles completed a Johnston Memorial Interventional Pain Management Pain Questionnaire, on which she stated that she suffered from stabbing, shooting pain with an average level of a seven on a 10-point scale. (R. at 661-62.) Broyles said, at its worst, her pain level was a nine on a 10-point scale, and, at its best, it was a two. (R. at 661.) Broyles rated her pain's effect on her ability to sleep at a seven on a 10-point scale and its effect on her activity level and work as a nine on a 10-point scale. (R. at 661-62.) Broyles also saw Dr. Thomas Sutton, M.D., on November 4, 2013, complaining of axial back pain with some very rare radicular pain. (R. at 657-59.) Broyles said she suffered right lower back pain, just above the sacrum off the midline about two fingerbreadths. (R. at 657.) Broyles said her pain was worse if she stood for any significant period of time, and she, on rare occasion, experienced pain which radiated down the posterior aspect of her leg to the calf and ankle. (R. at 657.) She had some numbness in her right leg. (R. at 657.) Broyles said that her first epidural steroid injection helped her pain for two weeks, and her second did not help whatsoever. (R. at 657.) Broyles said the pain was worse when she was more active, and nothing improved it. (R. at 657.)

On examination, Dr. Sutton noted that Broyles demonstrated positive facet loading to the right lower lumbosacral spine two fingerbreadths off the midline, with some light tenderness there. (R. at 658.) Dr. Sutton said that Broyles's pain was improved with forward flexion of the spine, and straight leg raise was negative. (R. at 658.) Broyles had 5/5 strength in her lower extremities, with no sensation deficits

noted. (R. at 658.) Broyles demonstrated appropriate affect. (R. at 658.) Dr. Sutton assessed lumbago with occasional right-sided lower extremity pain matching an L5 dermatomal pattern and degenerative disc disease and facet arthritis on her MRI. (R. at 658.) Dr. Sutton recommended that Broyles undergo diagnostic medial branch blocks to determine whether she would benefit from a medial branch denervation. (R. at 658.) Dr. Sutton performed a lumbar medial branch block at the L2-L5 levels on the right on December 6, 2013. (R. at 656.) Broyles was directed to keep a pain log for the next 24 hours to see if the block provided 50 percent or more pain relief. (R. at 656.) On her pain log, Broyles noted that her pre-procedure pain score was a five on a 10-point scale, a four 30 minutes after the procedure, a three from one to 12 hours after the procedure and a five 24 hours after her procedure. (R. at 655.)

On December 23, 2013, Broyles reported that her migraine headaches were doing well, and she was experiencing no anxiety symptoms. (R. at 648.) Rose noted that Broyles had joint pain, back pain and joint stiffness, but no joint swelling or limb pain or swelling. (R. at 649.) Broyles reported that she did not experience much relief from her block injection. (R. at 650.) On examination, Rose noted that Broyles's affect and mood were normal, and she was oriented to person, place and time. (R. at 652.) She had tenderness on palpation at the L5-S1 level, with restricted, painful flexion and extension. (R. at 652.) Left and right lateral flexion and left and right rotation were painful, but not restricted. (R. at 652.) Broyles had a normal gait. (R. at 652.) Rose noted that Broyles's depression with anxiety was stable. (R. at 654.) On May 30, June 20, August 12, and September 16, 2014, Broyles's complaints, and Rose's findings were almost identical to her December 23, 2013, visit. (R. at 601-09, 614-22, 627-47.)

Broyles received treatment for pain management from Blue Ridge Medical Management on December 12, 2014. (R. at 596-98.) Dr. James M. Wilson, M.D., administered trigger point injections in Broyles's back. (R. at 598.)

Broyles saw Rose again on March 3, 2015. (R. at 816-26.) Broyles reported that her asthma had been doing well, with no significant interval events since her last visit. (R. at 817.) Broyles reported a depressed mood. (R. at 817.) Rose noted no shortness of breath, no cough and no shortness of breath on exertion, but she noted worsened wheezing. (R. at 817.) Broyles complained of back pain and joint stiffness, but no joint swelling and no limb pain or swelling. (R. at 817.) Broyles reported anxiety and depression, but no suicidal ideation and no sleep disturbances. (R. at 817.) Rose noted that Broyles was in no acute distress, and her affect and mood were normal. (R. at 821-22.) On examination, Rose stated that Broyles's lumbar spine flexion, extension and left and right lateral flexion were restricted and painful, and rotation was not restricted, but it was painful. (R. at 822.) Broyles exhibited a normal gait. (R. at 822.)

Broyles saw Rose again on March 30, May 26, June 11, June 22, and July 17, 2015, with almost identical complaints and findings. (R. at 759-67, 770-92, 794-803, 806-15.)

Broyles saw Virginia Thurston, N.P., with MSMG Pain Management, on April 24, 2015. (R. at 804-05.) Broyles reported she began having back pain four years earlier. (R. at 804.) Broyles reported lying down improved her pain, and twisting, bending, standing and mopping worsened her pain. (R. at 804.) Broyles reported that physical therapy did not help, but acupuncture did help some. (R. at 804.) She reported that her pain level was a five, and she described it as a constant,

dull ache at times and a shooting, sharp pain at times. (R. at 804.) She said that the pain radiated down her leg and stopped at her knee. (R. at 804.) Thurston noted that Broyles was tender around the L4-5 area just about two fingerbreaths off the spine on the right side. (R. at 804.) Otherwise, her exam was normal. (R. at 804-05.) Thurston noted no extremity edema, a normal gait, normal extremity strength and normal mood, affect, insight and judgment. (R. at 804-05.) Thurston instructed Broyles to use heat and ice, alternating no more than 20 minutes at a time, up to four times a day, and she scheduled her for a denervation. (R. at 805.) On June 9, 2015, Dr. Sutton performed the denervation, or facet rhizotomy. (R. at 793.)

Broyles saw Thurston again on July 21, 2015. (R. at 750-55.) Broyles reported that, after she underwent a denervation in June, most of her pain had gone except for one spot in her back. (R. at 750.) Broyles rated her pain at a three. (R. at 750.) She said her pain could be intermittent at times, with increased good days. (R. at 750.) She said her pain was worse with sleeping wrong, twisting and long car rides. (R. at 750.) She said her pain was better when lying flat on her back on a hard surface, but she still would get some shooting pain down the back of her right leg on occasion. (R. at 750.) Thurston reported a normal gait and muscle strength and tone. (R. at 755.) She noted tenderness along the sacral sulcus on the right. (R. at 755.)

An MRI of Broyles's lumbar spine, performed October 6, 2015, showed normal alignment, vertebral body heights maintained with moderate disc space narrowing at L5-S1 with endplate changes and a broad-based annular bulge at L5-S1 with bilateral foraminal encroachment, no central canal stenosis and no significant facet arthrosis. (R. at 877.) The impression was degenerative disc disease with broad-based disc bulge and mild bilateral foraminal encroachment at L5-S1. (R. at 877.)

Broyles returned to see Dr. Smith for a consultation for right lower lumbar pain on October 9, 2015. (R. at 708-11.) Dr. Smith noted that Broyles was seen for the same complaint in March 2012. (R. at 708.) Dr. Smith noted that Broyles had undergone physical therapy two years earlier without any long-term benefit. (R. at 708.) She also had two lumbar epidural steroid injections in 2011, which also did not provide any long-term benefit. (R. at 708.) A denervation, performed in August 2015, relieved her right leg pain. (R. at 708.) Broyles reported that she no longer experienced leg pain and did not experience any bowel or bladder dysfunction. (R. at 708.) She said that her back pain was aggravated by sitting or standing for longer than 10 minutes, but she could not relate her pain to any specific accident or injury. (R. at 708.) She said the pain had been ongoing for the previous three years. (R. at 708.)

Broyles reported a history of hypertension, treated with medication, asthma, anxiety, depression and migraines. (R. at 708.) Broyles denied any history of syncope, seizures, transient ischemic attacks, stroke, paresthesia, anesthesia or paralysis. (R. at 709.) Dr. Smith noted that Broyles appeared to be in mild distress due to pain. (R. at 709.) Broyles's gait was nonantalgic, an examination of her spine, ribs and pelvis revealed tenderness of the right sacroiliac, ("SI"), joint and full range of motion in all planes with complaints of an increase in right-sided low back pain after range of motion testing, straight leg raise was negative bilaterally, Faber testing was negative on the right, Fortin finger test was positive on the right, and Gaenslen's testing was negative on the right. (R. at 709.) Dr. Smith stated that Broyles's muscle strength was 5+, and her tone was normal, with no atrophy in either lower extremity. (R. at 709.) Her sensation was intact to light touch and pinprick in the upper and lower extremities. (R. at 710.) Deep tendon reflexes were 2+ in her knees and ankles.

(R. at 710.) She was oriented to person, place and time, and her mood and affect were appropriate for her age and the situation. (R. at 710.)

Dr. Smith stated that an MRI, performed on October 6, 2015, showed a shallow broad-based disc protrusion lateralizing to the right at the L5-S1 level, abutting, but not displacing, the right S1 nerve root. (R. at 710.) Dr. Smith diagnosed disc displacement, L5-S1, central without compression, lateralizing to the right; chronic, right-sided low back pain; and disc degeneration in the lumbosacral region, L5-S1. (R. at 710.) Dr. Smith told Broyles that he did not believe surgery was warranted for her back pain until after further treatment options were attempted. (R. at 710.) Dr. Smith recommended SI joint injections. (R. at 710.) He referred her back to Dr. Sutton for this treatment. (R. at 710.) Dr. Smith stated that Broyles "may continue her employment and activities as a homemaker," with additional activities as tolerated. (R. at 710.)

Broyles returned to see Thurston on December 28, 2015, with complaints of constant, aching lower right back pain on the right buttock that radiated down the back of her leg stopping at her knee. (R. at 716.) Broyles said her pain was better with lying on a flat surface and worse with standing, walking, sitting and riding in a car. (R. at 716.) Broyles denied any numbness or tingling. (R. at 716.) Broyles complained of worsened anxiety due to family issues. (R. at 716.) She said that she was seeing a counselor, and she denied any suicidal or homicidal ideation. (R. at 716-17.) Broyles reported that her migraine headaches were stable, and her asthma was stable, with no recent flares. (R. at 716, 718.) Broyles exhibited a normal gait and normal muscle strength and tone. (R. at 721.) Broyles was tender along the right SI joint. (R. at 721.) Her sensory exam was normal to light touch and pinprick, with

normal motor exam. (R. at 721.) Broyles was oriented to person, place and time. (R. at 721.) Broyles was referred for physical therapy and injections. (R. at 721.)

Broyles saw Thurston again on June 23, 2016, complaining of constant right buttock pain. (R. at 828-33.) Broyles rated her pain as a six and described it as an aching and shooting pain, radiating down the back of her right leg stopping at the knee. (R. at 828.) Broyles said that sitting for long periods, as well as standing and driving, made the pain worse. (R. at 828.) She reported no tingling or numbness. (R. at 828.) Thurston noted a normal gait and normal muscle strength and tome. (R. at 833.) Thurston ordered physical therapy. (R. at 833.)

Dr. Sutton performed SI joint injections on Broyles on January 26 and July 26, 2016. (R. at 855, 857.)

On January 28, May 18, August 15 and November 11, 2016, Rose reported that Broyles continued to experience back pain and stiffness, but no limb pain. (R. at 1043, 1056, 1075, 1087.) Rose noted that Broyles exhibited tenderness at the L4-5 level, with flexion, extension, left lateral flexion, right lateral flexion and rotation to the right and left painful and restricted. (R. at 1048, 1061, 1079, 1093.) On January 28, 2016, Rose noted that Broyles's depression was stable, and she was being followed by a psychologist. (R. at 1086.) On August 15 and November 11, 2016, Rose noted that Broyles's anxiety was asymptomatic. (R. at 1043, 1056.)

Bryan Spain, D.P.T., performed a physical therapy evaluation of Broyles on January 28, 2016. (R. at 1100-02.) Broyles complained of constant, right-sided low back pain, ongoing for three years. (R. at 1100.) Broyles reported some relief with prior injections. (R. at 1100.) Broyles also complained of a dull ache with

intermittent sharp pains into her right hip. (R. at 1100.) She said that she had tried to remain active despite her pain. (R. at 1100.) Broyles said that increased activity, bending and sitting/standing for long duration aggravated her pain. (R. at 1100.) She stated that rest and her pain medication eased her pain. (R. at 1100.) Spain observed good mobility in Broyles's trunk and lower extremities. (R. at 1100.) He stated that Broyles exhibited moderate tenderness over the SI region and lumbar paraspinals on the right. (R. at 1101.) Rose had negative slump test, but positive straight leg raise test. (R. at 1101.) Spain noted decreased trunk range of motion and strength, lower extremity strength and increased pain and tenderness. (R. at 1101.) Broyles refused continuing physical therapy based on a lack of insurance. (R. at 1101.)

An MRI of Broyles's lumbar spine, performed on January 18, 2017, showed normal alignment, no focal vertebral body masses and endplate changes at L5-S1, which had progressed since her prior MRI. (R. at 867.) At the L4-5 level, bilateral facet osteoarthritis with some ligamentum flavum thickening was present, with no central stenosis or lateral recess narrowing or neural foraminal narrowing. (R. at 867.) At the L5-S1 level, a broad-based disc protrusion and bilateral facet osteoarthritis was noted, with mild bilateral neural foraminal narrowing, with no central stenosis. (R. at 867.)

Dr. Barrett W. Brown, M.D., with TN Brain and Spine, saw Broyles for a neurosurgical consultation for chronic back pain on March 7, 2017. (R. at 1041-42.) Broyles complained of back pain for the previous four years without any specific injury. (R. at 1041.) Broyles complained of pain shooting down the posterior aspect of the right ankle that improved following acupuncture. (R. at 1041.) She said her back pain had increased in the previous six to eight months. (R. at 1041.) She said that epidural steroid injections, several sessions of physical therapy and facet

rhizotomies gave her no relief. (R. at 1041.) Broyles stated that her symptoms were aggravated by standing, walking and sitting, but they improved with lying flat on her back. (R. at 1041.) Broyles rated her pain as a six on a 10-point scale. (R. at 1042.)

On examination, Dr. Brown noted that Broyles was alerted and oriented, she demonstrated 5/5 strength, and reflexes were 2 at the knees, but trace at the ankles. (R. at 1042.) Broyles had negative straight leg raise, but positive Faber testing on the right. (R. at 1042.) She had tenderness to palpation at the SI joints bilaterally. (R. at 1042.) Dr. Brown stated that an MRI presented for his review showed degenerative disc disease, most pronounced at the L5-S1 level, with some disc space collapse and desiccation and bulging and Modic changes in the vertebral bodies at L5 and S1. (R. at 1042.) Dr. Brown recommended facet injections. (R. at 1042.)

Broyles saw Dr. Martha Smith, M.D., of Pain Consultants of East Tennessee, on March 30, 2017, for complaint of low back pain. (R. at 1114-19.) Broyles complained of constant dull, sharp, aching pain located in the right lateral aspect of her lumbar spinous region and extending into the buttock, with intermittent radicular pain in her right lower extremity that extended in a posterior pattern down to the knee. (R. at 1114.) Broyles denied left-sided back pain or left lower extremity pain. (R. at 1114.) Broyles denied numbness/tingling, weakness or bowel/bladder incontinence. (R. at 1114.) Broyles rated her pain level at a six. (R. at 1114.) Broyles reported that she had received physical therapy in the past with no pain relief. (R. at 1114.)

On examination, Dr. Smith noted normal curvature of Broyles's lumbar spine, normal range of motion with greater pain on extension than flexion and right lateral

bending and pain with internal rotation of the right hip. (R. at 1116.) She noted negative sitting straight leg raises and negative Waddell's signs, axial loading and cogwheel rigidity, but pain in the right side of the low back with right-sided lying straight leg raise testing.  (R. at 1116.) Dr. Smith found no pain, laxity or crepitus and normal range of motion and good stability in Broyles's upper and lower extremities, but she complained of intermittent radicular pain in her right leg extending posteriorly to the knee. (R. at 1116.) Dr. Smith also noted normal strength, tone and movements in Broyles's upper and lower extremities. (R. at 1116.) She noted that Broyles could heel and toe walk without difficulty. (R. at 1116.) Dr. Smith recommended Broyles be scheduled for bilateral L5-S1 facet joint injections, (R. at 1119), which she administered on the same day. (R. at 1124.) Dr. Smith administered these injections again on April 20, 2017. (R. at 1125.) Her note from that date states that Broyles experienced 50 percent relief of radicular pain from the first injections on March 30, 2017. (R. at 1125.)

On May 9, 2017, Broyles told Dr. Brown that she had some relief from the facet injections. (R. at 1106.) Broyles also reported undergoing medial branch blocks, for which Dr. Brown did not have records. (R. at 1106.) Broyles reported some improvement in her symptoms with her second injection, but she subsequently developed increasing back pain. (R. at 1106.) Broyles complained of pain in the left side of her back, with pain down the right leg. (R. at 1106.) She said that she experienced a ripping sensation through her back every day. (R. at 1106.) She also reported swelling in her low back, extending across the midline from the left to right side, and swelling at her SI joint on the right. (R. at 1106.) Broyles rated her pain at a seven on a 10-point scale. (R. at 1106.) Dr. Brown reported no Hoffmann's, no clonus and negative straight leg raise bilaterally, but positive Faber testing bilaterally. (R. at 1106.) He stated that x-rays of the lumbar spine showed mild

degenerative changes without evidence of instability. (R. at 1106.) Dr. Brown diagnosed mild degenerative disc disease, and he said a prior MRI showed mild degenerative changes. (R. at 1106.) Dr. Brown recommended that Broyles exhaust all medical options prior to considering surgical intervention because he did not believe it would relieve her back pain. (R. at 1106-07.) On examination, Dr. Brown noted 5/5 strength with reflexes at 1/4 to trace, except for the knees, which were at three. (R. at 1106.)

Broyles returned to see Dr. Smith on May 30, 2017, with complaints of constant, moderate to severe low back pain. (R. at 1126.) Dr. Smith stated that Broyles's pain began at midline in the lower back, extended bilaterally into the left greater than the right paramedian aspects, then radiated into the left buttock and posteriorly down the right leg to the knee and, sometimes, to the ankle. (R. at 1126.) Broyles rated her pain as a six and stated that nothing improved her pain, and everything worsened it. (R. at 1126.)  Broyles denied muscle weakness or cramps, stiffness and joint swelling. (R. at 1128.) Broyles reported that the previous facet joint injections had failed to relieve her pain, and Dr. Smith stated she had no other procedures to offer her. (R. at 1132.)

Broyles returned to see Rose on June 2 and October 27, 2017. (R. at 1189-1201, 1289-1300.) Rose noted that Broyles appeared in no acute distress. (R. at 1195, 1294.) Broyles complained of back and joint pain and joint stiffness, but no limb pain, weakness or swelling. (R. at 1190, 1289.) Rose noted tenderness at the L4-5 level of Broyles's lumbar spine and flexion, extension, left and right lateral flexion and left and right rotation were restricted and painful. (R. at 1195, 1294.) Rose noted that Broyles's anxiety disorder and depression were asymptomatic. (R. at 1190, 1289.)

Broyles saw Dr. Cusano on December 27, 2017, and February 23, May 23, August 21 and November 26, 2018, with complaints of continuing back pain and stiffness. (R. at 1224-37, 1241-54, 1260-71, 1275-85, 1309-23.) Oddly, at other points, Dr. Cusano noted that Broyles complained of no back or joint pain or stiffness. (R. at 1225, 1242, 1310.) At other points, Dr. Cusano noted tenderness at the L4-5 level of Broyles's lumbar spine and flexion, extension, left and right lateral flexion and left and right rotation were restricted and painful. (R. at 1230, 1247, 1266, 1281, 1316.) Dr. Cusano also noted that Broyles's anxiety disorder and depression were asymptomatic. (R. at 1224-25, 1241-42, 1260-61, 1275, 1310.)

An MRI of Broyles's cervical spine, performed on November 6, 2018, showed mild spondylosis. (R. at 1328-29.) An MRI of Broyles's lumbar spine, performed on December 3, 2018, showed normal alignment, degenerative Modic endplate changes at L5-S1 and a circumferential disc bulge with disc desiccation, height loss and degenerative Modic endplate changes with mild facet arthropathy, producing mild bilateral foraminal narrowing with no canal stenosis at L5-S1. (R. at 1331-32.)

On November 13, 2018, Rose completed a check-box, mental assessment form, indicating that Broyles had extreme limitation in her ability to deal with work stresses; marked limitation in her ability to deal with the public; moderate limitations in her ability to relate to co-workers, to maintain attention and concentration; to understand, remember and carry out complex job instructions and to relate predictably in social situations; mild limitations in her ability to follow work rules, to interact with supervisors and to understand, remember and carry out detailed, but not complex, job instructions; and no limitations in her ability to use judgment in public, to function independently, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable

-28-

manner and to demonstrate reliability. (R. at 1305-07.) Rose did not describe any limitations or medical/clinical findings to support her assessment. (R. at 1307.) She stated that Broyles would miss more than two days of work a month due to her impairments or treatment. (R. at 1307.) Rose also provided a statement, dated November 14, 2018, that, in her opinion, Broyles could not work full or part time due to multiple joint pain and anxiety. (R. at 1308.) She stated that Broyles would miss more days than she worked. (R. at 1308.)

On December 4, 2018, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Broyles at the request of her counsel. (R. at 1334-42.) Broyles reported multiple difficulties, including back problems. (R. at 1334.) Lanthorn performed a mental status evaluation and administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), and the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"). (R. at 1334.) On the WAIS-IV, Broyles obtained a full-scale IQ score of 97. (R. at 1335.) Broyles stated that she was a high school and college graduate. (R. at 1335.) Lanthorn said that Broyles generated a valid MMPI-2 profile, with her test results, broadly, indicating that she was experiencing mild to moderate levels of emotional distress characterized by tension, anxiety and dysphoria, she perceived herself irritable and grouchy, she experienced little pleasure from life, she was a chronic worrier who brooded and ruminated about herself and her problems, she overreacted to minor stress with agitation, guilt and self-reproach, she lacked self-confidence, and she felt insecure, inadequate and inferior. (R. at 1339.) Lanthorn said that Broyles viewed herself as useless, she may struggle with concentration at times and find it difficult to keep her mind on a task or job, she was reluctant to start a task and gave up quickly when things went wrong, making decisions was difficult for her, with important decision nearly impossible, and she was prone to be pessimistic and hopeless. (R. at 1339.) He said that she

tended to be somewhat introverted and generally uncomfortable around others, with difficulty talking to people she did not know. (R. at 1339.) He said that her tests results indicated the presence of a significant degree of depression, worry, anxiety, tension and emotional discomfort. (R. at 1340.)

Broyles reported taking numerous medications, including Cymbalta, Norco and ibuprofen. (R. at 1336.) Broyles reported that she suffered from bulging discs in both the upper and lower portions of her spine, with most of her pain occurring in her lower back. (R. at 1336.) She rated her pain as a seven to eight on a typical day. (R. at 1336.) Lanthorn stated that medical records provided showed that Broyles had been diagnosed in the past with anxiety, asthma, hypertension, insomnia, history of hysterectomy, tonsillectomy, adenoidectomy and sinus surgery, right SI joint pain, MRSA infection, nicotine dependence, hyperlipidemia, history of depression, lumbar radiculopathy, aneurysm of a vein, migraine headaches, possible changes in right breast, borderline diabetes, umbilical hernia, pain and repair, obstructive sleep apnea, nontoxic solitary thyroid nodule, bilateral facet osteoarthritis at the L4-5 level and a history of psychotherapy. (R. at 1336-37.) Broyles claimed that she had previously treated with three different mental health counselors.[11] (R. at 1337.)

Lanthorn noted that Broyles was neatly, but casually, dressed, she had no auditory problems, her speech was clear and intelligible, and she was cooperative, pleasant and affable. (R. at 1337.) Broyles reported that she slept fitfully for only five to six hours a night and ate only one meal a day. (R. at 1337.) She described herself as depressed and placed her level of depression at four to five on a 10-point scale on a good day and at eight on a bad day. (R. at 1337.) She stated that she

---

[11] There are no treatment records from any mental health counseling in the administrative record.

preferred to be alone when her depression and anxiety was intense. (R. at 1337.) She denied suicidal or homicidal ideations, plans or intent. (R. at 1337.) Broyles said that she previously enjoyed photography and reading. (R. at 1337.) She described her sex drive as "non-existent." (R. at 1337.)  She said she felt both worthless and useless at times, but she denied any episodes of crying. (R. at 1337.)

Broyles stated that she had undergone multiple procedures, such as epidural shots, in the past and that she planned to undergo back surgery in 2019. (R. at 1337.) She said that she fatigued quite rapidly, both physically and mentally. (R. at 1337.) She stated that she had significant anxiety that came in phases, and, since 2002, had suffered a panic attack every one to two weeks. (R. at 1338.) Broyles said that she avoided crowded areas, and, at times, she felt claustrophobic. (R. at 1338.) When she suffered a panic attack, she said it was difficult to breathe, with shortness of breath, she got jittery, agitated, irritable and needed to "get out" of wherever she was. (R. at 1338.) She said that at least two major panic attacks were so bad she felt like she was dying. (R. at 1338.)

After 10 minutes, Broyles was able to recall four out of five words presented earlier. (R. at 1338.) She gave higher order and correct interpretations to three out of three commonly used adages and also spelled the word "world" correctly forwards and backwards. (R. at 1338.) Lanthorn diagnosed Broyles with a major depressive disorder, recurrent, moderate to severe, and generalized anxiety disorder. (R. at 1340.) He recommended that Broyles seek the services of a mental health professional. (R. at 1340.)

Broyles saw Dr. Joel Edward Norman, M.D., with TN Brain and Spine Knox, on January 7, 2019, for low back and left thigh pain. (R. at 1344-46.) Broyles

reported significant low back pain for at least five years. (R. at 1344.) She reported that she had tried lumbar epidural steroid injections, radiofrequency ablation and physical therapy with little to no relief. (R. at 1344.) She reported continuing low back pain with intermittent radiation to the right buttock. (R. at 1344.) She stated that her symptoms worsened with standing or lying down, alleviated by repositioning. (R. at 1344.) Dr. Norman noted that Broyles was alert, cooperative and in no acute distress, she ambulated with a symmetric gait, her motor strength was 5/5 in her lower extremities with intact sensation to light touch, and she exhibited negative straight leg raise. (R. at 1344.) Dr. Norman stated that an MRI of Broyles's lumbar spine revealed extensive degenerative disc disease, most prominently at the L5-S1 level, with near complete obliteration of the disc space at L5-S1, with Modic type 2 endplate changes in the L5 and S1 vertebral bodies and mild to moderate, left-sided greater than right, foraminal stenosis. (R. at 1345.) Dr. Norman recommended that Broyles be evaluated by Dr. Kropilak for surgical intervention. (R. at 1345.)

Broyles saw Dr. Michael Kropilak, M.D., with Premier Surgical Associates, PLLC, on January 9, 2019. (R. at 1348.)

On January 10, 2019, Lanthorn completed a mental assessment, indicating that Broyles had no limitation on her ability to understand, remember and carry out simple job instructions; mild limitations on her ability to function independently, to understand, remember and carry out detailed, but not complex, job instructions and to maintain personal appearance; and moderate limitations on her ability to follow work rules, to relate to co-workers, to deal with public, to use judgment in public, to interact with supervisors, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to

behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 1349-51.) He found that Broyles would be absent from work more than two days a month. (R. at 1351.)

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Broyles argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) In particular, Broyles argues that the ALJ erred by failing to give controlling weight to the opinions of her treating health care provider, Nurse Practitioner Rose, and examining mental health expert, Lanthorn, regarding her mental residual functional capacity. (Plaintiff's Brief at 5-6.)

The ALJ found that Broyles had the residual functional capacity to perform a range of sedentary work, except that Broyles was able to understand, remember and carry out simple instructions in repetitive, unskilled work; to attend, persist and concentrate for two-hour segments with normal breaks as allowed by the employer, but was able to complete a normal eight-hour workday/40-hour workweek; occasionally interact with the general public, co-workers and supervisors; and respond appropriately to supervisors, co-workers and usual work situations. (R. at 15.) In making this residual functional capacity finding, the ALJ stated that she was giving "limited weight" to Rose's assessment, except that she was giving "little weight" to Rose's statement that Broyles was unable to work. (R. at 22-23.) The ALJ also stated that she was giving Lanthorn's opinion "some weight." (R. at 22.) She also stated that she was giving the State Agency assessments "less weight." (R. at 22.)

While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, in claims filed prior to March 27, 2017, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) (2020). In fact, even an opinion from a treating physician will be accorded significantly less weight

if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, "an ALJ is not bound to adopt a medical opinion in its entirety, even when he gives it significant weight." *Fleenor v. Saul*, 2020 WL 808652, at *12 (W.D. Va. Jan. 29, 2020) (citing *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3rd Cir. 2006)).

The ALJ gave Rose's assessment "limited weight," except she gave "little weight" to Rose's statement that Broyles was unable to work. (R. at 22-23.) In Broyles's brief, her counsel appears to argue that the ALJ erred by not giving greater weight to Rose's assessment of Broyles's mental residual functional capacity. On November 13, 2018, Rose completed a check-box, mental assessment form, indicating that  Broyles had extreme limitation in her ability to deal with work stresses and marked limitation in her ability to deal with the public. In all other areas, Rose stated that Broyles's work-related mental abilities were satisfactory or better. She stated that Broyles would miss more than two days of work a month due to her impairments or treatment. (R. at 1307.) Rose also provided a statement, dated November 14, 2018, that, in her opinion, Broyles could not work full or part time due to multiple joint pain and anxiety. (R. at 1308.) She stated that Broyles would miss more days than she worked. (R. at 1308.) Rose did not describe any limitations or medical/clinical findings in either of these reports to support her assessment. (R. at 1307-08.)

In her brief, Broyles's counsel also appears to argue that the ALJ erred by giving Lanthorn's opinion only "some weight." (R. at 22.) On January 10, 2019, Lanthorn completed a check-box, mental assessment form, indicating that Broyles had no limitation on her ability to understand, remember and carry out simple job instructions; mild limitations on her ability to function independently, to understand,

remember and carry out detailed, but not complex, job instructions and to maintain personal appearance; and moderate limitations on her ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment in public, to interact with supervisors, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 1349-51.) "Moderate" was defined on this form as "more than a slight limitation … but the individual is still able to function satisfactory [sic]." (R. at 1349.) Lanthorn found that Broyles would be absent from work more than two days a month. (R. at 1351.)

It is apparent from the ALJ's very thorough decision, that she carefully evaluated the whole record before her in weighing the opinion evidence regarding Broyles's alleged mental impairment. Based on the ALJ's opinion, and the evidence of record, I find that substantial evidence supports both the ALJ's weighing of the medical evidence and her finding as to Broyles's residual functional capacity.

First, this court has found that assessments contained on check-box forms are not entitled to great weight. *See Cooper v. Saul*, 2019 WL 6703557, at *10 (W.D. Va. Oct. 29, 2019) (citing *Gerette v. Colvin*, 2016 WL 1296082, at *6 (W.D. Va. Mar. 30, 2016) (form reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudication process); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (check-box forms are of limited probative value); *Ferdinand v. Astrue*, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) (check-box forms are weak evidence at best); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (check-box assessments without

explanatory comments are not entitled to great weight, even when completed by a treating physician)).

Second, while Broyles complained of severe, frequent panic attacks, this record contains no reference to any complaints of panic attacks to her treating physicians. Also, while the medical evidence of record states that Broyles sought mental health counseling, this record contains no evidence from any mental health practitioner other than that of Lanthorn's consultative evaluation. What the record does show is that Dr. Cusano diagnosed Broyles with anxiety and depression, and he began prescribing medication to her for these conditions in 2009. (R. at 504.) Nonetheless, Dr. Cusano's and Rose's notes over the years clearly reflect that, with some medication adjustments, Broyles's complaints of anxiety and depression have remained stable since then. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). In fact, beginning in 2013, and continuing through 2014, Rose noted that Broyles's anxiety was asymptomatic. (R. at 615, 627, 648, 669, 702.) Broyles reported a depressed mood in March 2015, (R. at 817), but beginning on March 30, 2015, through January 2016, Rose continued to note that Broyles's anxiety and depression were stable. (R. at 758, 772, 796, 808, 1086.) In August and November 2016, Rose, again, noted Broyles's anxiety and depression were asymptomatic. (R. at 1043, 1056.) From June 2017 to November 26, 2018, Rose and Dr. Cusano noted that Brolyes's anxiety disorder and depression were asymptomatic. (R. at 1190, 1224-25, 1241-42, 1260-61, 1275, 1289, 1310.) I find that this evidence supports the ALJ's weighing of the mental health evidence and her finding with regard to Broyles's mental residual functional capacity.

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.   Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

2.   Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.   Substantial evidence exists in the record to support the Commissioner's finding that Broyles was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Broyles's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also

receive further evidence or recommit the matter to the magistrate judge
with instructions.

Failure to file timely written objections to these proposed findings and
recommendations within 14 days could waive appellate review. At the conclusion
of the 14-day period, the Clerk is directed to transmit the record in this matter to the
Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and
Recommendation to all counsel of record at this time.

DATED:     May 10, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE